UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NATIONAL TRAFFIC SERVICE, INC.,

        Plaintiff,

v.                                                                    **DECISION AND ORDER**
                                                                      08-CV-262-S

FIBERWEB, INC. and REEMAY, INC.,

        Defendants.

## I. INTRODUCTION

In this diversity action, Plaintiff National Traffic Service, Inc. ("National Traffic"), a New York corporation, brings suit against Defendant Fiberweb, Inc. ("Fiberweb"), a South Carolina corporation, claiming breach of contract and unjust enrichment.[1] Plaintiff's claims arise out of Defendant's failure to pay Plaintiff for negotiating discounted rates with freight carriers in the second year of the parties' agreement. Presently before this Court is Defendant's Motion for Summary Judgment.[2] For the reasons discussed below, Defendant's motion is granted in part, and denied in part.

## II. BACKGROUND

**A.    Facts**

Plaintiff, National Traffic, is a New York corporation with its principal place of

---

[1] Although the caption of the case lists Fiberweb, Inc. and Reemay, Inc. as defendants, they are, in fact, a single corporate entity. Originally known as Reemay, Inc., Defendant amended its certificate of incorporation on November 11, 2006, changing its name to Fiberweb, Inc.

[2] In support of its Motion for Summary Judgment, Defendant filed the Affidavit of Joann Salek with attached exhibits; a Local Rule 56.1 Statement of Material Facts; a Memorandum of Law; and a Reply Memorandum. (Docket Nos. 19, 20, 21, 28.)
    In opposition to Defendant's motion, Plaintiff filed the Affidavit of Garret Oswald with attached exhibits; a Memorandum of Law; and a Statement of Material Undisputed Facts. (Docket Nos. 24, 25, 26.)

1

business in Amherst, New York, and is a provider of transportation logistics services. (Plaintiff's Statement of Material Undisputed Facts ("Pl.'s Statement"), Docket No. 26, ¶ 1.) Defendant, Fiberweb, is a South Carolina corporation with its principal place of business in Old Hickory, Tennessee.  (Defendant's Local Rule 56.1 Statement of Material Facts ("Def.'s Statement"), Docket No. 20, ¶¶ 1, 5.)  Defendant is engaged in the business of developing and manufacturing high performance nonwoven fabrics, used in a variety of commercial products. (Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Mem."), Docket No. 21, 2-3.)

On December 8, 2005, the parties entered into a 2-year Logistics Management Services Agreement ("Agreement"), whereby National Traffic agreed to provide logistic management services for Fiberweb's domestic and international shipping. (Pl.'s Statement ¶¶ 2, 3, 4.)  Such services included negotiating freight contract rates, preparing freight transportation plans, auditing and paying freight carrier bills, submitting weekly progress reports, and various related tasks.  (Id. ¶ 4.)  Payment for National Traffic's services was set in accordance with two separate fee structures.  For the first year, National Traffic would receive a percentage of document savings it had generated through its negotiations. (Id. ¶ 7.)  In the second year, National Traffic would be paid by a separate criteria listing compensation rates for completion of specific tasks, including filing weekly reports, auditing, on-line carrier routing, and 30% of documented negotiated savings for carrier negotiation services.  (Id.)

Pursuant to National Traffic's agreement to provide carrier negotiation services, the Agreement authorized National Traffic to negotiate contracts with authorized carriers on Fiberweb's behalf.  (Id. ¶ 25.)  The Agreement also reserved Fiberweb's right not to be

bound by any of the negotiated contracts. (Id.) Finally, the Agreement granted Fiberweb the right to end the Agreement for any reason on thirty days notice. (Id. ¶ 3.) If Fiberweb did so within the first twelve months of the Agreement, it would be obligated to pay National Traffic a fee based on projected savings. (Id.)

For the first year of the Agreement, National Traffic negotiated discounted rates with Fiberweb's carriers, realizing savings of $383,136. In accordance with the Agreement, Fiberweb paid National Traffic 30% of that amount, or $114,940. (Id. ¶ 9.) National Traffic received confirmation from Fiberweb to again negotiate discounted rates for the second year of the Agreement. (Id. ¶ 10.) Following negotiations, National Traffic presented Fiberweb with a transportation plan detailing the expected cost savings. (Id. ¶¶ 15, 16.) The transportation plan did not take into account the closure of three of Fiber's manufacturing locations. (Id. ¶ 22.) The unaccounted for closures corresponded with an approximately 10% decrease in overall shipping volume. (Id.) Fiberweb elected not to adopt National Traffic's transportation plan. (Id. ¶ 17.) Although Fiberweb did use several of the carriers included in the transportation plan, it did so at the original year one rates. (Def.'s Statement ¶ 30.)

National Traffic now seeks payment of 30% of the expected savings detailed in the transportation plan, that National Traffic alleges would have been realized had Defendant adopted the plan.

**B. Procedural History**

National Traffic commenced this action on March 28, 2008 by filing a complaint in the United States District Court for the Western District of New York. On March 31, 2010, Fiberweb filed the instant Motion for Summary Judgment.

### III.  DISCUSSION

**A.     Choice of Law**

Neither party disputes that Tennessee law should govern this dispute pursuant to § 10.1 of the Agreement.  Determining the controlling substantive law requires application of New York's choice of law rules.  Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 151 (2d Cir. 2008) (quoting Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 419 (2d Cir. 2001)).  New York courts will enforce a contractual choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.  Aramarine Brokerage, Inc. v. OneBeacon Ins. Co., 307 Fed. Appx. 562, 564 (2d Cir. 2009); Burns v. Del. Charter Guarantee & Trust Co., No. 10 Civ. 4535, 2011 WL 2314835, at *6 (W.D.N.Y. June 8, 2011).  Fiberweb's principal place of business is in Old Hickory, Tennessee.  In addition, at the time the parties entered into the agreement, Fiberweb was operating eight separate manufacturing facilities, including two in Tennessee.  On this basis, the Court finds that there is a reasonable relationship between the choice of Tennessee law and the parties, and will apply Tennessee law to the construction and interpretation of the Agreement.

**B.     Summary Judgment Standard**

Summary Judgment is warranted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).  A fact is material if it "might affect the outcome of the suit under governing

law." <u>Anderson</u>, 477 U.S. at 248.

The party seeking summary judgment must first demonstrate the absence of any disputed material facts. The opposing party is then required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); <u>Holcomb v. Iona College</u>, 521 F.3d 130, 137 (2d Cir. 2008). To carry this burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), and it "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . or upon the mere allegations or denials of the adverse party's pleading," <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995) (internal quotation and citations omitted).

In assessing whether summary judgment is appropriate, the court's obligation is to view the evidence and the inferences drawn from the evidence "in the light most favorable to the party opposing the motion." <u>Adickes v. S.H. Kress and Co.</u>, 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249. "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991).

**C.     Plaintiff's Breach of Contract Claim**

Under Tennessee law, "a plaintiff seeking damages for an alleged breach of

contract must prove: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of contract." AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc., No. 09 Civ. 5377(HB), 2010 WL 3322530, at *3 (S.D.N.Y. Aug. 19, 2010) (quoting Ervin v. Nashville Peace & Justice Ctr., 673 F. Supp. 2d 592, 612 (M.D. Tenn. 2009)).

Neither party disputes that there is an enforceable contract. The only issue therefore is whether Fiberweb breached its contract by not paying National Traffic 30% of the savings Fiberweb would have realized had it adopted National Traffic's transportation plan.

Plaintiff argues that Fiberweb breached the Agreement by not accepting National Traffic's transportation plan because National Traffic had negotiated with Fiberweb's carriers as Fiberweb's agent. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n."), Docket No. 25, 11.) The relevant language in § 4.2 of the Agreement states:

> [National Traffic] shall be authorized to act as [Fiberweb's] logistics management agent to negotiate contracts with Authorized Carriers. **[NATIONAL TRAFFIC] MAY NOT BIND [FIBERWEB] INTO ANY CONTRACTUAL AGREEMENT.**
> [Fiberweb] will review and approve, prior to implementation, the Carrier agreements. [Fiberweb] will also review [National Traffic's] forms and suggest additions and changes, which [National Traffic] will not unreasonably reject.

(Affidavit of Joann Salek ("Salek Aff."), Docket No. 19, Ex. 3) (emphasis in original).

National Traffic contends that interpreting this provision to allow Fiberweb to unilaterally reject any carrier with whom National Traffic negotiates would be inconsistent with National Traffic acting as Fiberweb's agent. (Pl.'s Opp'n 10-12.) Defendant responds

6

that the second sentence merely limits the agency relationship by granting National Traffic the power to negotiate on behalf of Fiberweb, but not to execute contracts on its behalf. (Defendant's Memorandum of Law in Further Support of Motion for Summary Judgment ("Def.'s Reply"), Docket No. 28, 9.)

Plaintiff also relies on language in Attachment B of the Agreement. The relevant section states that:

> Compensation to [National Traffic] will be two different structures with the first year being based on a percentage of documented savings generated by [National Traffic] negotiations and second and subsequent years being based on the following criteria: . . . . Carrier negotiation services[–] 30% of documented negotiated savings for one year.

(Salek Aff. Ex. 3.)

National Traffic points out that payment in the second year would be based on "30% of documented *negotiated* savings for one year", whereas the first year's payment would be based on only "a percentage of documented savings." (Pl.'s Opp'n 12) (emphasis added). Defendant responds that the difference in language merely reflects the fact that at the time of the Agreement, National Traffic had already negotiated carriers rates, requiring a slight change in language from "documented negotiated savings" to "documented savings generated by [National Traffic] negotiations." (Def.'s Reply 4-6.) Defendant also draws attention to use of the word "documented", which Fiberweb argues refers to the weekly variance reports National Traffic was expected to file. This word would have been omitted, Fiberweb continues, if the parties had intended National Traffic to collect a percentage of Fiberweb's projected savings without needing to apprise Fiberweb, through weekly variance reports, of aggregated savings. (Id. 6-7.)

"The court's initial task in construing the contract is to determine whether the language is ambiguous." Ray Bell Const. Co., Inc. v. State, No. E2009-01803-COA-R3-CV, 2010 WL 4810670, at *11 (Tenn. Ct. App. 2010) (citing Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 889-90 (Tenn. 2002)). "When the language of the contract is plain and unambiguous, courts determine the intentions of the parties from the four corners of the contract, interpreting and enforcing it as written." Crye-Leike, Inc. v. Carver, No. W2010-01601-COA-R3-CV, 2011 WL 2112768, at *4 (Tenn. Ct. App. May 26, 2011) (quoting Union Realty Col, Ltd. v. Family Dollar Stores of Tenn., Inc., 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007)).

Here, the Court finds the language at issue unambiguous. There is nothing inconsistent between Fiberweb appointing National Traffic its agent for purposes of negotiations, while reserving the right to decline any contract offers. See Richey v. Motion Industries, Inc., No. 3:07-CV-466, 2009 WL 1076200, at *4 (E.D. Tenn. Apr. 21, 2009) (denying summary judgment where principal introduced evidence that agents required upper management approval when entering long-term contractual commitments); see also cf. Kelly v. Longmire, 435 S.W.2d 818, 821-22 (Tenn. 1968) ("[I]t is the settled rule in Tennessee . . . that a contract authorizing a real estate agent to sell a tract of land does not authorize the agent to make a contract of sale which would be binding on the owner . . . .") "An agent's actual authority 'consists of the powers which a principal directly confers upon an agent or causes him to believe himself to possess.'" Id. (quoting Milliken Group, Inc. v. Hays Nissan, Inc., 86 S.W.3d 564, 567 (Tenn. Ct. App. 2001). Fiberweb put National Traffic on clear notice that National Traffic "**MAY NOT BIND [FIBERWEB] INTO**

**ANY CONTRACTUAL AGREEMENT.**" (Salek Aff. Ex. 3.) § 4.2 further states that "[Fiberweb] will review and approve, prior to implementation, the Carrier agreements," in clear contradiction of National Traffic's interpretation that its negotiations would result in binding contracts. (Id.)

The rest of the Agreement supports this interpretation. § 4.1 states, in relevant part, that "[National Traffic] shall be responsible for developing a Transportation Plan that will provide *recommendations* for Primary, Secondary, and Alternate Carriers when they are competitive in service and price." (Id.) (emphasis added). § 1.2 similarly states that "[National Traffic] shall include transportation plans for each [Fiberweb] facility . . . that includes: *recommendation* of qualified carriers." (Id.) (emphasis added). Were National Traffic's interpretation adopted, the transportation plans would never be "recommendations," because they would actually be binding on Fiberweb. Furthermore, the difference between year one's "documented savings generated by [National Traffic] negotiations" and year two's "documented negotiated savings" is negligible and does not envision the kind of payment structure National Traffic seeks to impose. Consequently the Court concludes that the contract means what it says. Fiberweb was not required to accept the contracts negotiated by National Traffic.

Plaintiff also argues, however, that Fiberweb committed a breach of contract by breaching its duty to act in good faith. (Pl.'s Opp'n 13-14.) National Traffic challenges Fiberweb's stated reasons for rejecting the transportation plan, namely that the plan relied on substandard carriers and failed to account for the closure of three of Fiberweb's manufacturing plants. Fiberweb does not dispute that it rejected the transportation plan

9

on those grounds, but alleges that the grounds were reasonable and therefore did not breach the Agreement. (Def.'s Mem. 11.)

Tennessee imposes an implied covenant of good faith and fair dealing in the performance of all contracts. SecurAmerica Bus. Credit v. Schledwitz, No. W2009-02571-COA-R3-CV, 2011 WL 3808232, at *12 (Tenn. Ct. App. Aug. 26, 2011) (citing Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 685, 686 (Tenn. 1996). The purpose of this covenant is to honor contracting parties' expectations and protect the rights of parties to receive the benefits of the agreement they entered into. Isaac v. Ctr. for Spine, Joint, & Neuromuscular Rehabilitation, No. M2010-01333-COA-R3-CV, 2011 WL 2176578, at *4 (Tenn. Ct. App. June 1, 2011) (quoting Barnes & Robinson Co. v. OneSource Facility Servs., 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006)). However, the implied obligation to act in good faith does not create new contractual rights or obligations. Id. Rather, the extent of the duty varies from contract to contract. Id.

In considering a duty of good faith, "courts examine the language of the contract and review the intention of the parties in order to 'impose a construction which is fair and reasonable.'" Davidson & Jones Development Co. v. Elmore Development Co., Inc., 921 F.2d 1343 (6th Cir. 1991) (quoting Covington v. Robinson, 723 S.W.2d 643, 645-46 (Tenn. Ct. App. 1986)). The question of reasonableness "is a factual question to be determined by the trier of fact and, if there is a dispute, summary judgment would not be proper." Educ. Placement Serv., Inc. v. Watts, 789 S.W.2d 902. 904-05 (Tenn. App. 1989); see also Naylor Med. Sales & Rentals, Inc. v. Invacare Continuing Care, Inc., No. 09-2344-STA-cgc, 2011 WL 2175206, at *9 (W.D. Tenn. June 3, 2011) ("[W]hether a party acted in good faith is a question of fact.") However, "[s]ummary judgment may be appropriate on

a question of good faith or reasonableness where there is no dispute as to material facts and the movant is entitled to judgment as a matter of law." Monday v. Regions Bank, No. 3:08-0789, 2010 WL 753327, at *5 (M.D. Tenn. Mar. 4, 2010) (citing Old Republic v. Eshaghpour, No. M1999-01918-COA-R3-CV, 2001 WL 1523364, at *8 (Tenn. Ct. App. Nov. 30, 2001)).

Fiberweb cites two reasons for rejecting National Traffic's transportation plan. The first is that the plan employed local carriers that did not offer the same level of service or reputation for reliability and promptness, as the national carriers Fiberweb used during the Agreement's first year. (Def.'s Mem. 11.) National Traffic challenges this ground on the basis that Fiberweb continued using many of the same so-called "substandard" carriers included in the plan, despite rejecting the plan itself. National Traffic also lists the various service awards carriers included in the plan have received to undermine Fiberweb's contention that these carriers were under-qualified. (Pl.'s Opp'n 13-14.) Fiberweb does not deny the substantial cross-over between the carriers it describes as substandard and the carriers it continued using, nor does it point to any specific quality deficiency in any of the remaining carriers. The Court further notes that, when Fiberweb gave National Traffic the go-ahead to begin negotiations, Fiberweb was well-aware of the carriers with which National Traffic was entering negotiations. (Pl.'s Statement ¶ 13.) Consequently, this Court cannot find Fiberweb's rejection on this ground in good faith. See NBC Capital Markets Group, Inc. v. First Bank, 25 Fed. Appx. 363, 366 (6th Cir. 2002) (implied duty of good faith requires parties to make reasonable effort and exercise reasonable diligence,

which are questions of fact defying summary judgment where there is a dispute).[3]

Fiberweb's second reason for rejecting the transportation plan is that the plan was based on outdated information. (Def.'s Mem. 11.) National Traffic does not deny that its transportation plan failed to factor in the closure of three facilities, but contends that this only affected 10% of overall shipping volume and that its fee would have been reduced in the same proportion as Fiberweb's savings. (Pl.'s Opp'n 14.) Fiberweb contests this figure, alleging that the closure of these three facilities actually represented half of all projected savings. (Salek Aff. ¶ 35.) Because National Traffic is the non-moving party, the Court draws all reasonable inferences in its favor, and will assume, for purposes of this motion, that the closures would only have impacted 10% of Fiberweb's voume and savings. See Adickes, 398 U.S. at 158-59.

Having already discussed Fiberweb's alleged concerns regarding the carriers' quality, the decision to accept the transportation plan becomes a question of "mere value," with the parties' only interest being the expected cost savings. See First Bank, 25 Fed. Appx. at 366. In such a transaction, National Traffic "was entitled to expect . . . that [Fiberweb] would not reject a facially acceptable [plan] on other than objectively reasonable grounds." Id. The question of what constitutes objectively reasonable was addressed in First Bank. That case involved an agreement whereby defendant bank agreed to sell a loan portfolio with plaintiff's assistance. Id. at 364. Plaintiff was given the exclusive right to market the portfolio and defendant agreed to pay a fee to plaintiff on that portion of the portfolio actually sold in the event at least one acceptable bid was submitted and the

---

[3] Fiberweb appears to admit as much, notably omitting any reference to this argument in its Reply Memorandum. (See Def.'s Reply 9-10.)

transaction was closed. Id. Although defendant received a bid, the bank ultimately rejected it after determining that the sale would not be profitable. Id. at 365. Despite plaintiff's attempts to salvage the deal, defendant refused to complete the sale. Id. Consequently, plaintiff collected no fee for its services and brought an action against the bank for failure to use its best efforts in completing the sale. Id.

The court of appeals reversed a grant of summary judgment in the bank's favor, framing the question as whether "[plaintiff] abdduced no more than a mere scintilla of evidence in support of a finding that [defendant] failed to use its best efforts." Id. at 366. The court found that whether the bank had used its best efforts to determine the bid's profitability was a genuine issue, despite the bank having reserved the right to find any and all bids unacceptable. Id. The court held that plaintiff had raised questions of material fact because the bank at first accepted the bid, then revoked acceptance a day later, and refused plaintiff's efforts to consummate the sale. Id. at 368.

Similarly here, the record is insufficient to find that Fiberweb undisputably acted in good faith. Fiberweb, like defendant in First Bank, had the contractual right to decline any contract negotiated by National Traffic. However, in so doing, it was under an obligation to act on objectively reasonable grounds. Id. (remarking that bank "not free to reject a facially acceptable bid based on mere whim or fancy"). Again, according to Fiberweb, those grounds were, first, because the plan made use of substandard carriers and, second, because it failed to include the closure of three of Fiberweb's manufacturing facilities. As already discussed, this Court is unpersuaded by Fiberweb's first justification.

Fiberweb's second justification, while, more persuasive is also insufficient to grant Fiberweb's motion. The record does not reveal any attempt to work with National Traffic

to rectify a mistake which, if National Traffic's figures are correct, as the Court assumes they are, amount to only 10% of overall shipping volume. This was sufficient to raise a question in First Bank, and it does so here as well. In addition, the record also does not reveal how significant a 10% decrease is, given that any revised transportation plan submitted by National Traffic would merely have decreased overall savings by the same proportion as Fiberweb's reduced manufacturing. (See Oswald Aff. ¶ 26.)

Finally, there is some doubt as to whether Fiberweb actually rejected the plan for the reasons alleged. According to National Traffic's Vice President of Sales and Marketing, Garret Oswald, the main reason Fiberweb gave him for rejecting the plan was that Fiberweb had used the savings from year one of the agreement to reduce customer costs and did not feel the need to reduce costs further in year two. (Oswald Aff. ¶ 21.) As Mr. Oswald himself attests, "if the reason given to [him] by [Fiberweb's Strategic Purchasing Director Ms. Salek] is the actual reason, it makes no sense, since the cost saving would have enabled Fiberweb to charge its customers less for its own products." But whether Fiberweb's real reasons will make sense or not, Mr. Oswald's affidavit casts doubt on Fiberweb's stated justifications for rejecting the transportation plan, and serves to preclude summary judgment.

Fiberweb's Motion for Summary Judgment will be denied as to National Traffic's breach of contract claim.

## C.     Plaintiff's Unjust Enrichment Claim

Plaintiff believes that the contract must either be interpreted in its favor, or else be found invalid. If the contract is invalid, National Traffic argues, it is entitled to recover for negotiating services rendered under a theory of unjust enrichment. One of the necessary

elements a party must prove to recover under a theory of unjust enrichment is that "there is no existing, enforceable contract between the parties covering the same subject matter." Rocky Top Realty, Inc. v. Young, No. E2009-00338-COA-R3-CV, 2010 WL 118777, at *4 (Tenn. Ct. App. Jan. 13, 2010) (citing Doe v. HCA Health Servs. of Tenn., Inc., 46 S.W.3d 191, 197-98 (Tenn. 2001)).  Having found that here there is an enforceable contract, this Court need not further consider National Traffic's unjust enrichment claim.

Fiberweb's Motion for Summary Judgment will be granted as to National Traffic's unjust enrichment claim.

### IV.  CONCLUSION

For the reasons stated above, Fiberweb's Motion for Summary Judgment is granted as to National Traffic's unjust enrichment claim, and denied as to National Traffic's breach of contract claim.

### V.  ORDERS

IT IS HEREBY ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 19) is GRANTED in part and DENIED in part.

SO ORDERED.

Dated:      October 29, 2011
            Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        Chief Judge
                                        United States District Court